UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

LYDIA R. WILLIAMS,

                    Plaintiff,

        -vs-                              **No. 1:13-CV-01186 (MAT)**
                                          **DECISION AND ORDER**
CAROLYN W. COLVIN, ACTING
COMMISSIONER OF SOCIAL SECURITY,
                    Defendant.

---

## I.    Introduction

        Represented by counsel, Lydia R. Williams ("plaintiff") brings this action pursuant to Titles II and XVI of the Social Security Act ("the Act"), seeking review of the final decision of the Commissioner of Social Security ("the Commissioner") denying her applications for disability insurance benefits ("DIB") and supplemental security income ("SSI"). The Court has jurisdiction over this matter pursuant to 42 U.S.C. § 405(g). Presently before the Court are the parties' cross-motions for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure.[1] For the reasons discussed below, plaintiff's motion is granted to the extent that this matter is remanded to the Commissioner for further administrative proceedings consistent with this Decision and Order.

---

[1] Plaintiff originally moved for judgment on the pleadings on May 23, 2014. Doc. 9. After the Commissioner supplemented the administrative record with further materials, plaintiff submitted, and this Court accepted, an amended motion for judgment on the pleadings, which was filed October 21, 2014. Doc. 16. The Commissioner responded to that motion and cross-moved for judgment on the pleadings on December 14, 2014. Doc. 19.

## II.  Procedural History

The record reveals that in June 2011, plaintiff (d/o/b May 29, 1969) applied for DIB and SSI, alleging disability as of March 23, 2010. After her applications were denied, plaintiff requested a hearing, which was held via videoconference before administrative law judge Lucian A. Vecchio ("the ALJ") on September 7, 2012. The ALJ issued an unfavorable decision on September 27, 2012. The Appeals Council denied review of that decision and this timely action followed.

## III. Summary of the Evidence

The record, which spans two volumes, reveals that plaintiff suffered from mental impairments in addition to substance abuse dependence. Medical records indicate that plaintiff was hospitalized on several occasions, for issues related to mental health and substance abuse. In February 2011, plaintiff was treated WCA Hospital in Jamestown, New York for "[d]epression/depressive symptoms" and suicidal ideation. T. 338. Plaintiff's treating psychiatrist at WCA, Dr. Chaundhry, recommended that plaintiff be admitted, and she was transferred to Lake Shore Hospital in Irving, New York because no beds were available.[2] Plaintiff reported that she was on prescribed medication from her primary doctors and admitted to "increasing dosages on her own." T. 342.

From March 18, 2011 through April 7, 2011, plaintiff was admitted to WCA Hospital for an inpatient chemical dependency

---

[2] Records from Lake Shore do not appear in the record.

2

treatment program. Plaintiff was diagnosed, on Axis I, with primary diagnoses of alcohol, cocaine, and nicotine dependence, as well as bipolar disorder. On Axis II, plaintiff was diagnosed with personality disorder, NOS, with antisocial narcissistic features. Treatment notes indicate that plaintiff had been hospitalized for chemical dependency treatment on six prior occasions, and had last been seen at WCA Hospital in May 2010 in association with a suicide attempt. Plaintiff reported that she "last thought about hurting herself last month when she was at Lake Shore Hospital Psychiatric Unit." T. 351. Upon discharge, plaintiff's medications included Trazodone (an antidepressant and sedative), Remeron (an antidepressant), and Xanax (for anxiety), as well as several prescription medications for physical conditions including migraines and back pain.

Plaintiff was admitted to Warren General Hospital in Warren, Pennsylvania, from May 21 through May 24, 2011, for treatment of depression with suicidal ideation. Dr. Ernesto Roederer noted that plaintiff "had two previous [inpatient] psychiatric admissions at Jones Hill in Jamestown for depression and suicide attempt by overdose." T. 476. Plaintiff reported that she had relapsed into cocaine and alcohol use two days after being released from her prior inpatient program, and sought readmission to that program but was rejected. She also reported "significant depression and anxiety symptoms," and Dr. Roederer recommended that she return to a "28-day inpatient treatment program with a dual diagnoses focus."

T. 477. On discharge from Warren General, plaintiff's medications included Effexor (an antidepressant) and Klonopin (a sedative), as well as medications prescribed for physical conditions.

In October 2011, plaintiff was evaluated for psychiatric and crisis intervention by Jamestown Mental Hygiene. Plaintiff reported that she had been "off her psychiatric medications for about six weeks and [was] doing poorly," and her "chief complaint" was recorded as "I've lost my mind." T. 668. It was noted that plaintiff had a "significant history of polysubstance dependence and anxiety and depressive symptoms." T. 670. Plaintiff continued to treat at Jamestown Mental Hygiene for medication management, and was prescribed Effexor, Klonopin, and Lunesta (a sleep aid) for her psychiatric symptoms.

From June 26 through June 29, 2012, plaintiff was admitted to WCA Hospital for treatment of substance abuse disorder, anxiety, and "thoughts of harming others." T. 789. Her discharge summary noted that the hospitalization was "[one] of the multiple, similar presentations for this 43-year-old African American female who has been managed by Dr. Chaundhry, as well as other inpatient units including Olean and Lakeshore Hospital in the past." Id. Upon discharge, her Axis I primary diagnoses were mood disorder, NOS and alcohol dependency, continuous. Global assessment of functioning upon admission was 25 to 35 upon admission, and 60 upon discharge.[3]

---

[3] See generally American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV"), at 34 (4th ed. rev. 2000). A GAF of 21 to 30 indicates that a patient's

On July 1, 2012, plaintiff treated again at WCA Hospital, for a suicide attempt via medication overdose. She was admitted to the TLC Mental Health Unit in Irving, New York from July 2 through July 5, for monitoring, safety, and stabilization. Plaintiff reported being "off her medications so she started using alcohol and crack to self-medicate her moods." T. 856. Nurse Practitioner Kyle Wiktor concluded that as a result, "[s]he was thus decompensating in her mental health." Id. Her Axis I primary diagnoses were mood disorder, NOS, and polysubstance dependence. She was prescribed Trazodone (an antidepressant and sedative) and Effexor.

Plaintiff also suffered from physical impairments. Her primary care physician, Dr. David Krempa, noted in March 2011 that imaging tests showed "[m]arked degenerative disc disease at C3-4, C4-5 [and] C5-6 with central disc protrusion mild to mod[erate] in degree causing mild focal spinal stenosis," bony degenerative change of the cervical spine, degenerative changes "secondary to fairly prominent scoliosis" in the thoracic spine, and lumbar scoliosis "with associated hypertrophic bony degen[erative] change." T. 269. Over the time period spanning June 2010 through

---

behavior is considerably influenced by delusions or hallucinations or serious impairment, in communication or judgment; a GAF of 31-40 indicates some impairment in reality testing or communication or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood; and a GAF of 60 indicates moderate symptoms (e.g., flat affect and circumlocutory speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers).

June 2011, Dr. Krempa also diagnosed plaintiff with post traumatic cervical myofascial pain syndrome, post traumatic cervical myalgia, post traumatic headaches, sleep disturbances, post traumatic migraine with aura, and morbid obesity. Plaintiff also treated for her back conditions with Dr. Brooke Kelly, who in March 2012 assessed her with lumbar strain, cervical paraspinous strain, suboccipital neuralgia, myofascial pain syndrome, lumbar spine stenosis most severe at L2-3 and L3-4, and cervical herniated nucleus pulposus moderate to mild at C5-6 with degenerative disc disease at C3-4 and C4-5.

Despite the voluminous evidence regarding plaintiff's various impairments, the record contains no formal functional assessment from any treating or examining physician, with regard to either her mental or physical impairments. The only limited assessment of plaintiff's functional capabilities, from a treating source, came from treatment notes of Dr. Kelly dated March 2011 and June 2012, in which she opined that plaintiff was not "totally disabled from all type[s] of work" due to physical impairments, but she could not lift greater than 20 pounds "due to [motor vehicle accident]." T. 674, 1059. Dr. Kelly did not assess any of plaintiff's functional capabilities relative to any functions other than lifting.

At the hearing, the ALJ questioned psychiatric expert Dr. Albadin Halperin. Dr. Halperin, who had reviewed plaintiff's file but did not examine her, testified that "even though

[plaintiff] [did] have a psychiatric diagnosis," she was "seen as capable of functioning and not meeting a listing, or whatever listings are preempted by the fact that she[] [was] actively using drugs." T. 54. Dr. Halperin based this opinion on his reference to the treatment record of plaintiff's June 26 through June 29, 2012 admission to WCA Hospital, which indicated that she had a GAF of 25-35 upon admittance and 60 upon discharge.

## IV. The ALJ's Decision

Initially, the ALJ found that plaintiff met the insured status requirements of the Act through June 30, 2012. At step one of the five-step sequential evaluation, see 20 C.F.R. §§ 404.1520, 416.920, the ALJ determined that plaintiff had not engaged in substantial gainful activity since March 23, 2010, the alleged onset date. At step two, the ALJ found that plaintiff suffered from the following severe impairments: morbid obesity; degenerative joint disease/degenerative disc disease of the cervical, thoracic, and lumbosacral spine, with scoliosis and spinal stenosis of the lumbosacral spine; hypertension; diabetes mellitus, Type II; sleep disorder; cocaine dependence; alcohol dependence; nicotine dependence; mood disorder, not otherwise specified ("NOS"), with bipolar disorder features; post-trauamatic stress disorder ("PTSD"); and personality disorder, NOS, with antisocial narcissistic features.

At step three, the ALJ found that plaintiff did not have an impairment or combination of impairments that met or medically

equaled a listed impairment. In considering the paragraph B criteria, see 20 C.F.R. § 404 Subpart P, App. 1 § 12.00, the ALJ found that plaintiff had moderate restrictions in ADL and social functioning; mild difficulties in maintaining concentration, persistence, or pace; and "one or two" episodes of decompensation of extended duration. T. 23. The ALJ found that "while [plaintiff had] several inpatient admissions, most [were] related to her [drug abuse or alcoholism]." Id.

Before proceeding to step four, the ALJ determined that plaintiff retained the RFC to perform unskilled sedentary work as defined in 20 C.F.R. §§ 404.1567(a), 404.1568(a), 416.967(a), 416.968(a). At step four, the ALJ found that plaintiff was unable to perform past relevant work. Finally, at step five, the ALJ found that considering plaintiff's age, education, work experience, and RFC, there were jobs existing in significant numbers in the national economy which plaintiff could perform. Accordingly, he found that she was not disabled.

## V.  Discussion

A district court may set aside the Commissioner's determination that a claimant is not disabled only if the factual findings are not supported by "substantial evidence" or if the decision is based on legal error. 42 U.S.C. § 405(g); see also Green-Younger v. Barnhart, 335 F.3d 99, 105-06 (2d Cir. 2003). "Substantial evidence means 'such relevant evidence as a reasonable

mind might accept as adequate to support a conclusion.'" Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000).

### A.    RFC Finding; Failure to Develop the Record

Plaintiff contends that the ALJ's RFC assessment is unsupported by substantial evidence, primarily because the ALJ had no competent medical source opinion from which to draw his conclusion that plaintiff was limited as delineated in the RFC finding. The Court agrees. See, e.g., Cyman v. Colvin, 2015 WL 5254275, *7 (W.D.N.Y. Sept. 9, 2015) (remanding where ALJ came to RFC determination without the benefit of any medical source statement as to both mental and physical impairments). Remand is required so that the ALJ may obtain medical source opinions, preferably from treating sources, addressing plaintiff's functional limitations relating to both physical and mental impairments.

The regulations provide that although a claimant is generally responsible for furnishing evidence upon which to base an RFC assessment, before the Administration makes a disability determination, the ALJ is "responsible for developing [the claimant's] complete medical history, including arranging for a consultative examination(s) if necessary, and making every reasonable effort to help [the claimant] get medical reports from [the claimant's] own medical sources." 20 C.F.R. §§ 404.1545, 416.945 (citing 20 C.F.R. §§ 404.1512(d) through (f)). Although the RFC determination is an issue reserved for the commissioner, "an ALJ is not qualified to assess a claimant's RFC on the basis of

bare medical findings, and as a result an ALJ's determination of RFC without a medical advisor's assessment is not supported by substantial evidence." <u>Dailey v. Astrue</u>, 2010 WL 4703599, *11 (W.D.N.Y. Oct. 26, 2010) (quoting <u>Deskin v. Comm'r of Soc. Sec.</u>, 605 F. Supp. 2d 908, 912 (N.D. Ohio 2008)).

Despite the extensive record in this case, the ALJ failed to properly develop the record by obtaining a medical source opinion as to plaintiff's functional capabilities. The ALJ not only failed to obtain a treating source opinion, but also failed to obtain any consulting examining opinion from a state agency medical professional with regard to her physical or mental impairments. This case is therefore distinguishable from the oft-cited <u>Tankisi v. Comm'r of Soc. Sec.</u>, 521 F. App'x 29, 34 (2d Cir. 2013), in which the Second Circuit found that because the record was *otherwise complete*, and included an informal treating physician opinion and a consulting opinion from an examining source, the ALJ did not err by failing to request a treating source opinion. Here, the absence of any medical source opinion left a clear gap in the record, which triggered the ALJ's duty to further develop it by obtaining such opinions regarding plaintiff's physical and mental limitations. See <u>Crawford v. Astrue</u>, 2014 WL 4829544, *20 (W.D.N.Y. Sept. 29, 2014) ("[W]here the medical findings in the record merely diagnose [the] claimant's exertional impairments and do not relate those diagnoses to specific residual functional capabilities . . . [, the Commissioner] may not make the connection himself.")

(quoting Deskin v. Comm'r of Soc. Sec., 605 F. Supp. 2d 908, 912 (N.D. Ohio 2008)).

Therefore, the ALJ's conclusion that plaintiff could perform unskilled sedentary work in a "limited contact" setting is left unsupported by substantial evidence in the record. See Guarino v. Colvin, 2016 WL 690818, *2 (W.D.N.Y. Feb. 22, 2016) ("[T]he ALJ had no medical source opinions on which to rely in formulating his RFC finding. As such, his RFC determination constituted an impermissible interpretation of bare medical findings.") (citing Cyman v. Colvin, 2015 WL 5254275, *7 (W.D.N.Y. Sept. 9, 2015) (remanding where ALJ came to RFC determination without the benefit of any medical source statement as to both mental and physical impairments); Haskins v. Astrue, 2010 WL 3338742, *5 (N.D.N.Y. Apr. 23, 2010), report and recommendation adopted, 2010 WL 3338748 (N.D.N.Y. Aug. 23, 2010) (remanding where "[t]he ALJ failed to re-contact Plaintiff's treating physicians, failed to obtain an SSA consultative examination, and failed to request the opinion of a medical expert")).

On remand, the ALJ is directed to obtain statements from plaintiff's treating sources regarding plaintiff's functional capacity as to both her mental and physical impairments. If necessary, the ALJ may also obtain consulting examining opinions regarding plaintiff's functional limitations. The Court emphasizes that in order to make a proper determination of plaintiff's RFC in this case, it is incumbent upon the ALJ to obtain medical source

opinions from sources who have actually treated, or at the very
least personally examined, plaintiff.

### B.    Drug Abuse or Alcoholism

Plaintiff contends that the ALJ failed to properly apply the
drug abuse or alcoholism ("DAA") standards set forth in 20 C.F.R.
§§ 404.1535, 416.935. The Court agrees, and finds that the ALJ's
failure to properly apply those standards resulted in a finding
unsupported by substantial evidence. See Straughter v. Comm'r of
Soc. Sec., 2015 WL 6115648, *21 (S.D.N.Y. Oct. 16, 2015) ("When DAA
is shown to be at issue in a claim, the ALJ must make a finding as
to the materiality of DAA to the claimant's disability, and this
finding must be supported by substantial evidence.").

The regulations relating to DAA provide that an ALJ is to
consider all of plaintiff's limitations including those associated
with drug or alcohol abuse, formulate an RFC based on the entirety
of those limitations, and come to a finding of disability. Id.
After making that determination, the ALJ is required to make a
finding as to "which of [a claimant's] current physical and mental
limitations . . . would remain if [the claimant] stopped using
drugs or alcohol and then determine whether any or all of [the
claimant's] remaining limitations would be disabling." Id. If the
remaining limitations render the plaintiff disabled even in the
absence of DAA, then DAA "is not a contributing factor material to
the determination of disability." Id. As explained below, the ALJ's
finding that plaintiff's DAA was not a contributing factor material

to the determination of disability reflected an erroneous application of the analysis set forth in the regulations and was unsupported by substantial evidence.

In his decision, the ALJ found that "DAA [was] not a contributing factor material to this determination that [plaintiff was] not disabled," apparently based on testimony provided by psychiatric expert Dr. Halperin. T. 29. Although Dr. Halperin's testimony appeared to implicitly acknowledge that plaintiff's functioning was quite deficient at least upon admission to the hospital in June 2012, Dr. Halperin never provided any functional assessment of her capabilities either while using or while abstaining from substances. Thus, Dr. Halperin's testimony left the ALJ unable to properly apply the DAA standards, which required him to "evaluate which of [plaintiff's] current physical and mental limitations, upon which . . . [the] disability determination [was based], would remain if [plaintiff] stopped using drugs or alcohol and then determine whether any or all of [plaintiff's] remaining limitations would be disabling." 20 C.F.R. §§ 404.1535(b)(2), 416.935(b)(2). Under the regulations, the ALJ was required to first evaluate plaintiff's functional capacity *while using substances*, and then evaluate her functional capacity *while not using substances*, but his decision does not follow this analysis. In the absence of this analysis, it is impossible for the Court to meaningfully review the ALJ's finding regarding DAA.

Further issues exist with regard to Dr. Halperin's testimony, which issues influenced the ALJ's DAA analysis.[4] Upon questioning from plaintiff's attorney at the hearing, Dr. Halperin testified that plaintiff "[had] had several" periods of decompensation, but that they "appear[ed] to be" related to substance abuse. T. 56. However, Dr. Halperin did not explain his conclusion as to why those periods of decompensation were related specifically to substance abuse, and he did not explain whether they were *also* related to mental health impairments. Moreover, as noted above, Dr. Halperin offered no functional assessment of plaintiff's limitations.

Additionally, at the hearing, the ALJ essentially cut plaintiff's attorney off during a line of questioning relating to the critical issue of whether plaintiff's substance abuse was inextricably intertwined with her mental condition:

**Examination of Psychological Expert by Claimant's Attorney**

Q       Actually, some of [the hospitalizations] are related to substance abuse, but, however, if you would look at Exhibit 4F and 6F, she was admitted to the hospital on two occasions for anxiety and bipolar disorder and suicidal ideations.

ALJ: She was using at that time, counsel. What    are we to conclude from it?

_____

[4] The Court notes that the transcript of the hearing contains many references to inaudibility, and it is not entirely clear if the transcript captured the full import of Dr. Halperin's testimony. The ALJ's decision does nothing to clear up any confusion on that point.

> ATTY:  Well, I was just concluding that not all  t h e times she was admitted was due to her          drug abuse.
>
> ALJ: Are you suggesting she was not engaged in drug abuse at the time that she was admitted, as indicated in 4F?
>
> ATTY:  As in 6F.
>
> ALJ: She was using [INAUDIBLE] -- she was using at that time.
>
> ATTY: All right. Then no further questions.

T. 56-57.

Thus, the ALJ improperly focused the issue on whether plaintiff was using substances at all – not whether the substance abuse was actually a material factor contributing to a finding of disability. As plaintiff points out, this is significant because case law establishes that where limitations associated with substance abuse cannot be parsed out from mental health limitations, substance abuse *cannot* be held material to a finding of disability. See <u>Frankhauser v. Barnhart</u>, 403 F. Supp. 2d 261, 274 (W.D.N.Y. 2005) ("When it is not possible to separate mental restrictions and limitations imposed by the DAA and the various mental disorders shown by the evidence, a finding of 'not material' would be appropriate.") (citing SSA Emergency Teletype, "Questions and Answers Concerning DAA from July 2, 1996 Teleconference—-Medical Adjudicators—-ACTIONS," August 30, 1996, Answer 29).

Depending on whether DAA was a material factor, Dr. Halperin's testimony that plaintiff had "several" episodes of decompensation

was obviously relevant to consideration of the Paragraph B criteria of the listings. See 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00 (defining "repeated episodes of decompensation" as "three episodes within 1 year, or an average of once every 4 months, each lasting for at least 2 weeks"). The ALJ's finding that plaintiff had suffered "one or two" episodes of decompensation was clearly in conflict with Dr. Halperin's testimony that she had had several, and the issue remains as to whether DAA was a material contributing factor in those episodes or whether DAA cannot be separated from plaintiff's mental impairments.

Although the ALJ's finding that DAA was not a contributing factor to disability, coupled with his ultimate finding that plaintiff was not disabled, creates the impression that the ALJ found plaintiff not disabled *regardless* of whether her substance abuse was considered, the ALJ's review of the record belies that conclusion. The ALJ noted plaintiff's poor functioning while abusing substances and credited Dr. Halperin's opinion, which recognized that plaintiff had several episodes of decompensation and extremely low GAF scores while abusing substances. Again, it is important to note that Dr. Halperin's opinion was based on a review of the record and not upon a personal examination and consultation with plaintiff. Thus, it is apparent to the Court that the ALJ failed to follow the proper analysis of whether plaintiff's limitations, stemming from *all* of her impairments including substance abuse, were disabling, prior to coming to an ultimate

conclusion of disability based solely on limitations stemming from plaintiff's non-substance abuse related impairments.

On remand, the ALJ is directed to contact a treating source for an opinion as to what mental limitations would remain were plaintiff to abstain from polysubstance abuse. In coming to his decision on remand, the ALJ must follow the specific requirements of the regulations in evaluating whether DAA is a factor material to the determination of disability in this case. See 20 C.F.R. §§ 404.1535, 416.935. Accordingly, the ALJ must first assess plaintiff's limitations considering all of her impairments, including her substance abuse, and come to a disability determination. If the ALJ finds, as this record strongly indicates, that plaintiff would be disabled considering all of her impairments, the ALJ must then proceed to determine whether she remain "disabled independent of [her] drug addiction or alcoholism." 20 C.F.R. §§ 404.1535(b)(2)(ii), 416.935(b)(2)(ii).

## C. Credibility

Having found remand necessary, the Court declines to address plaintiff's argument regarding credibility. Plaintiff's credibility must be reconsidered on remand upon thorough consideration of the newly developed administrative record as a whole.

## VII. Conclusion

For the foregoing reasons, the Commissioner's motion for judgment on the pleadings (Doc. 19) is denied and plaintiff's amended motion (Doc. 16) is granted to the extent that this matter

is remanded to the Commissioner for further administrative proceedings consistent with this Decision and Order.  The Clerk of the Court is directed to close this case.

**ALL OF THE ABOVE IS SO ORDERED.**


                                        **S/Michael A. Telesca**
                                        HON. MICHAEL A. TELESCA
                                        United States District Judge

Dated: April 18, 2016
         Rochester, New York.